# United States Court of Appeals
# for the Fifth Circuit

———————

No. 25-70002

———————

United States Court of Appeals
Fifth Circuit

**FILED**

July 14, 2026

Lyle W. Cayce
Clerk

Jason Keller,

*Petitioner—Appellant*,

*versus*

Burl Cain, *Commissioner, Mississippi Department of Corrections*; Lynn Fitch, *Attorney General of the State of Mississippi*,

*Respondents—Appellees*.

———————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:21-CV-134

———————————————————

Before Stewart, Haynes, and Higginson, *Circuit Judges*.

Per Curiam:[*]

In this habeas case, Jason Keller alleges that the state court unreasonably applied Supreme Court precedent and made unreasonable factual determinations when affirming his conviction and death sentence. Keller was convicted and sentenced to death for shooting the owner of a convenience store during the course of a robbery. Hours after the murder,

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

police attempted to pull him over, and Keller exited the vehicle holding a shotgun choke in a way that he thought would resemble a gun. Police shot him, and he was rushed to a hospital. He made three statements while in the hospital—two in the emergency room ("ER") and one in the intensive care unit ("ICU"). The trial court suppressed the ER statements but not the ICU statement. Among other things, Keller challenged the refusal to suppress the ICU statement on appeal. After the trial court held a hearing on remand, as required by the Mississippi Supreme Court, the case came back to the Mississippi Supreme Court and it affirmed. Keller sought federal habeas relief, but the federal district court denied his petition and declined to grant a certificate of appealability. Keller later received a certificate of appealability from our court regarding the ICU confession and now challenges the admission of that ICU statement on a few grounds. For the following reasons, we AFFIRM.

## I.    Background

### A.    Factual Background

On June 21, 2007, Jason Keller wrecked a truck that he had stolen, abandoned the vehicle, and made his way toward the Food Mart convenience store. Armed with a stolen gun, Keller walked into the Food Mart to buy cigarettes. He robbed the store and, ultimately, murdered the store's owner, Hat Thi Nguyen, who was working at the register. He was ultimately found by the police. In an attempt to commit suicide-by-cop, he pointed a shotgun choke at the police in a way that resembled a gun. Officers shot Keller, and he was transported to Biloxi Regional Medical Center.

Officers attempted to interrogate Keller twice while he was in the ER. Investigator Craig Shows took the first statement from Keller. After his

No. 25-70002

*Miranda*[1] rights were read, Keller admitted that he killed Nguyen, told officers where he left the murder weapon, and gave officers that address. About half an hour later, Keller gave a second statement in the ER. Investigator Michael Brown took this statement, and no additional *Miranda* warning was provided.

The day after the shooting—14 hours after Keller's arrival at the hospital, and 11 hours after his second ER statement—Investigator Brown conducted a recorded interview with Keller while he was in a different part of the hospital, the ICU. Investigator Brown read Keller his *Miranda* rights, and Keller said he understood. Keller explained the previous day's robbery, murder, and surrounding events in detail. Discussing his impression of Keller much later, Investigator Brown explained that Keller was "awake and alert," "surprisingly upbeat," did not "appear to be under the influence of any narcotics," and was "coherent."

### B.    Prosecution

Keller was later indicted for capital murder. Keller sought to suppress the two ER statements and the ICU statement. The trial court held an evidentiary hearing.

The trial court excluded the ER statements but not the ICU statement. With respect to the ER statements, the court found that Keller was unable to voluntarily waive his *Miranda* rights but did not determine whether the ER statements were coerced. With respect to the ICU statement, however, the trial court explained that, after Investigator Brown read Keller his *Miranda* rights, "Keller clearly responded that he understood

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

he was waiving his rights," and his "demeanor was much different than during the first two statements."

The case proceeded to trial, and the jury found Keller guilty of capital murder and sentenced him to death. One of the State's witnesses was Investigator Brown, and he testified regarding the ICU statement, which was introduced through him and played for the jury.

## C.    Direct Appeal

Keller appealed and asserted, among other things, that the ICU statement was erroneously admitted. The Mississippi Supreme Court ordered a limited remand so that the trial court could conduct an evidentiary hearing and decide for the first time whether any of Keller's three statements were coerced.

On remand, the trial court heard testimony and received documentary evidence. Keller relied primarily on testimony from Dr. Joseph Jackson, a board-certified neurologist and psychiatrist. Dr. Jackson explained that, by the time Keller gave the ICU statement, he had received at least 30 milligrams of morphine, had not slept, and had cocaine still in his system. "Based on the way [Dr. Jackson] th[ought] about things," Keller "would have not been able to make a free and clear decision to . . . testify." Dr. Jackson also discussed the officers' interrogation techniques. He explained that the officers' statement that they "didn't know what the next few minutes or hours would hold" for Keller was "inappropriate" because it suggested that this may be his "last chance . . . to confess," and that officers helped Keller make his statement by "restructuring" their questions. The State called Dr. Gregory Bredemeier, who treated Keller in the ER. He explained that he gave Keller 5 milligrams of morphine to start, which is far below the upper dosing limits. This dose would not have rendered Keller "incoherent" or unable to understand what was going on around him.

Dr. Bredemeier explained that the half-life of morphine is "1.5 to 4.5 hours," and that it is common to receive doses of "2 to 15 milligrams every 4 hours." Keller received additional doses of morphine consistent with this routine while in the ER—14 milligrams total. But Keller did not "appear confused" and spoke clearly before leaving the ER. Dr. Bredemeier acknowledged that Keller had cocaine in his system but noted that this would not have made Keller incoherent or unable to understand what was going on. After considering all the evidence, the trial court concluded, *inter alia*, that none of the statements were coerced.

When the case returned, the Mississippi Supreme Court agreed with the trial court and rejected Keller's claims, including his assertion that the ICU statement should have been suppressed. *See Keller v. State*, 138 So. 3d 817, 847–54 (Miss. 2014). It determined that even if the ER statements had been coerced, the ICU statement was admissible because it "was freely and voluntarily given" and purged of any taint. *Id.* at 848, 852. The court further held that *Missouri v. Seibert*, 542 U.S. 600 (2004), which held that "*Miranda* warnings are ineffective" if a "question first, warn later" technique is used, was inapplicable. *Id.* at 849–52. The court agreed that Keller's ICU statement was voluntary, and the trial court's findings were "supported by the record." *Id.* at 850–51. Thus, the Mississippi Supreme Court concluded that "Keller gave a full confession to the murder in a series of coherent, narrative responses to Investigator Brown's questions" and the record was devoid of any support for "a theory that the statements made in Keller's two suppressed interrogations were exploited to secure a subsequent confession." *Id.* at 850. The court was not persuaded by Dr. Jackson's testimony. *See id.* at 851. It also held that Keller's *Miranda* waiver was voluntary—"he sounded alert, spoke coherently, did not appear to be in pain, and responded to the questions with clear, understandable answers." *Id.* at 854 (citation modified). The court explained that "even if 'I understand,' is

5

not an express waiver, the demeanor and responses of Keller throughout the interview were sufficient to convey an implied waiver and willingness to confess to police." *Id.* (citation modified).

### D.    Post-Conviction Proceedings

After the Mississippi Supreme Court denied his application for post-conviction relief, *Keller v. State*, 306 So. 3d 706, 715 (Miss. 2020) (en banc), Keller sought federal habeas relief. He filed his petition in the Southern District of Mississippi. The district court denied relief and refused to grant Keller a certificate of appealability ("COA"). Keller sought and we granted a COA only as to: "Whether the Trial Court erred in failing to suppress the final recorded statement elicited from [Keller] while he was in the [ICU]."

## II.    Jurisdiction & Standard of Review

The district court exercised jurisdiction over this federal habeas case under 28 U.S.C. § 2254. After granting a COA, we have jurisdiction to decide the certified issue under 28 U.S.C. §§ 1291 and 2253.

"When assessing a denial of habeas relief, we review the district court's findings of fact for clear error and its conclusions of law de novo." *Sanchez v. Davis*, 936 F.3d 300, 304 (5th Cir. 2019).

## III.    Discussion

Keller contends that the Mississippi Supreme Court erred in a few respects regarding the ICU statement. As he must, Keller contends that the court's decisions were out of step with Supreme Court precedent and/or involved unreasonable determinations of the facts in his case.

We review habeas petitions regarding state court cases under the standards set out in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *Pierre v. Vannoy*, 891 F.3d 224, 227 (5th Cir.), *as revised* (June 7, 2018). "AEDPA prohibits federal habeas relief for any claim adjudicated

on the merits in state court, unless one of the exceptions listed in § 2254(d) obtains." *Cobb v. Thaler*, 682 F.3d 364, 372 (5th Cir. 2012) (quoting *Premo v. Moore*, 562 U.S. 115, 121 (2011)). Under § 2254(d), a federal court may not grant habeas relief on a state court case "unless the state court's decision (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court . . . ; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* (citation modified).

"A state-court decision is contrary to clearly established federal law only if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if it resolves a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019) (en banc) (citation modified). A state court's application of clearly established law is unreasonable when it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). As for a state court's factual findings, AEDPA requires us "to presume state court findings of fact to be correct unless the petitioner rebuts that presumption by clear and convincing evidence." *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)). Each avenue under § 2254(d) "is difficult to meet . . . because it was meant to be." *Harrington*, 562 U.S. at 102.

Keller argues that the Mississippi Supreme Court erred when concluding that his ICU statement was: (A) not fruit of the poisonous tree; (B) not a deliberate exploitation of *Miranda*; (C) voluntary; and (D) provided after Keller validly waived his *Miranda* rights. We address each of these contentions in turn. But, in the end, we conclude that the district court did not err.

No. 25-70002

### A.    Not fruit of the poisonous tree

Keller avers that the ICU statement "was impermissibly tainted by the" involuntary nature of the ER statements, and that "the Mississippi Supreme Court's conclusion that the third statement was sufficiently removed from the first two statements to purge the primary taint was an unreasonable application of Supreme Court precedent." We disagree.

It is clear from the trial court's orders that, while it found the ER statements inadmissible on *Miranda* grounds, it did not find them to be coerced. Because the trial court found that the ER statements were given in violation of *Miranda*, it was, of course, right to exclude them. *See Miranda*, 384 U.S. at 494. However, only if they were taken in violation of due process can they taint the subsequent ICU statement. *Oregon v. Elstad*, 470 U.S. 298, 308 (1985) (citing *Michigan v. Tucker*, 417 U.S. 433, 446 (1974)).

In *Wong Sun v. United States*, the Supreme Court established a variation of the "fruit of the poisonous tree" doctrine, under which evidence obtained after lawless police conduct is inadmissible unless "the connection between [the conduct] and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." 371 U.S. 471, 487 (1963) (citation modified). In contexts such as this, the doctrine controls only where there is "actual infringement of the suspect's constitutional rights"—that is, where "actual compulsion" exists. *Elstad*, 470 U.S. at 308 (citing *Tucker*, 417 U.S. at 445–46). Even then, *Wong Sun* was clear that a prior violation of due process in obtaining some evidence does not necessarily mandate the exclusion of later-obtained evidence. 371 U.S. at 487–88. The subsequent evidence may be admissible if "the connection between [the conduct] and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." *Id.* at 487.

The Mississippi Supreme Court's articulation of the legal framework was not inconsistent with this authority. As that is the case, we must now

8

look to see, as Keller contends, whether the court made an unreasonable determination of the facts on this score—that is, whether his ER statements were coerced.

To be involuntary, and thus inadmissible under the Fourteenth Amendment, a confession must have been elicited by police coercion. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the Due Process Clause of the Fourteenth Amendment.").[2] A defendant's deficient mental condition alone is not sufficient to render a confession involuntary. *Id.* at 164. Accordingly, Keller's focus on facts relating to his mental state does not demonstrate coercion. Keller avers that, when affirming the trial court's finding that the ER statements were not coerced, the Mississippi Supreme Court failed to consider various facts. For instance, he contends that the court failed to recognize that, while being questioned in the ER, Keller received medical treatment and experienced physical suffering. He also makes much of Dr. Jackson's testimony that, during the ICU questioning, Keller "seemed even more eager to try to please the officer[s]" and "he felt a relationship with the police officers"; "there was a lot of restructuring of questions [by the officers]"; and Keller was "susceptible . . . [because] [h]e was at a point where he thought he was dying or going to die." But, again, an individual's mental state alone is not enough to find coercion under the Fourteenth Amendment. *Id.*

The trial court's findings concerning medical treatment and pain during the ER questioning, as well as Dr. Jackson's testimony about Keller's

---

[2] "The cases considered by this Court . . . have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct." *Id.* at 163–64 (citation modified).

mental state and susceptibility, certainly support the trial court's finding that "Keller was unable to have knowingly, voluntarily, and willingly waived his rights under *Miranda* at that time." *Keller*, 138 So. 3d at 847. But the fact that the officers knew of his condition and continued to question him does not amount to coercion. Supreme Court precedent requires conduct more coercive in nature than mere continuation of questioning. *Connelly*'s discussion of *Blackburn v. Alabama*, 361 U.S. 199 (1960), is relevant to this point. 479 U.S. at 164–65. In *Blackburn*, the Court concluded that a confession was coerced where "the police learned during the interrogation that [the defendant] had a history of mental problems," *Connelly*, 479 U.S. at 164, and subjected the defendant to an "eight-to nine-hour sustained interrogation" where he was "in a tiny room which was upon occasion literally filled with police officers," he was away from his "friends, relatives, or legal counsel," and the confession was composed not by the defendant, but by the police officer. 361 U.S. at 200, 208–09 (citation modified). The Court concluded that the defendant's confession was involuntary after considering the fact that he "was insane and incompetent at the time he allegedly confessed" in conjunction with these "other pertinent circumstances." *Id.* at 207–08. Such additional circumstances were not present here. The officers merely returned for additional questioning. The fact that they did so after observing Keller's poor condition does not alone amount to coercion.

Additionally, as the State points out, not only did the officers testify that they did not "coerce" or "threaten" Keller or promise him anything in exchange for his statements, but the trial court listened to the audio recording of the ER statements and came to the same conclusion. While Dr. Jackson testified that "there was a lot of restructuring of questions [by the officers]," the trial court would have heard the questioning itself on the audio recording

and still determined it was not coercive. Our review of the audio concludes that this finding was reasonable.

Thus, the Mississippi Supreme Court did not unreasonably determine the facts when concluding that there was no police coercion, and the district court did not err in affirming this conclusion.

*        *        *

The district court was correct to conclude that the Mississippi Supreme Court's refusal to apply the fruit-of-the-poisonous-tree doctrine was not an unreasonable application of the law and did not involve an unreasonable determination of the facts.

## B.    Not a deliberate exploitation of *Miranda*

Keller next avers that Investigator "Brown employed a systematic interrogation technique designed to exploit the prior *Miranda* violations," pointing to *Seibert*. We hold that the district court did not err by concluding that the Mississippi Supreme Court rightfully refused to apply *Seibert* in this case.

First, the Mississippi Supreme Court's refusal to apply *Seibert* was not an unreasonable application of the law. In *Seibert*, the Court addressed a situation in which prior unwarned statements make future statements inadmissible—that is, where an officer uses "[t]he technique of interrogating in successive, unwarned and warned phases." 542 U.S. at 609. In that case, the police officer "made a 'conscious decision' to withhold *Miranda* warnings," and employed "an interrogation technique he had been taught: question first, then give the warnings, then repeat the question 'until [he] g[ot] the answer that [the defendant had] already provided once.'" *Id.* at

605–06.[3] The Court held that "the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted." *Id.* at 617. The Court concluded that a statement elicited by this two-step interrogation technique is not admissible on the authority of *Elstad* because there is a difference between a "good-faith *Miranda* mistake" such as in *Elstad*, *id.* at 615, and a "police strategy adapted to undermine the *Miranda* warnings," *id.* at 616.

Keller seems to argue that *Seibert* should apply here because the Court in *Seibert* held that *any* exploitation of a prior statement, not just the two-step technique in a single-interview scenario, renders a later *Miranda* warning ineffective. We disagree.[4] The Mississippi Supreme reasonably concluded that the *Seibert* holding specifically addressed the two-step interrogation technique the Court described. 542 U.S. at 616–17; *see also United States v. Lim*, 897 F.3d 673, 692 (5th Cir. 2018).

Second, the Mississippi Supreme Court's conclusion that this case is distinct from *Seibert*—in that no two-step interrogation occurred here—was not an unreasonable determination of the facts. The relevant inquiry is whether "[i]t would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at

---

[3] The officer questioned the defendant for 30 to 40 minutes and obtained a confession before giving her a 20-minute break. *Id.* at 604–05. Then, he returned, recited her *Miranda* warnings, obtained a signed waiver, resumed questioning, confronted her with her prewarning statements, and got her to repeat the same information. *Id.* at 605. Upon initiating the warned portion of the interrogation, "the police did not advise [the defendant] that her prior statement could not be used." *Id.* at 616.

[4] Notably, Keller did receive a *Miranda* warning before his first ER questioning, and the second ER questioning was a short time later. He was then provided another *Miranda* warning in the ICU.

the second stage what had been said before." *Seibert*, 542 U.S. at 616–17. *Seibert* provided the following factors for consideration:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and [4] setting of the first and the second, [5] the continuity of police personnel, and [6] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

Analyzing these factors, we determine that this case differs meaningfully from *Seibert* such that the conclusion that the officers did not employ a two-step interrogation technique was a reasonable determination of the facts. We address each factor in turn.

Concerning the "completeness and detail of the questions and answers in the first round of interrogation" and "overlapping content of the two statements," while some of the content from the ER statements and ICU statement overlapped, the ICU statement contained greater detail concerning the robbery, murder, and surrounding events than did the ER statement. Regarding the "timing," in *Seibert*, "[t]he warned phase of questioning proceeded after a pause of only 15 to 20 minutes." 542 U.S. at 616. But here, there were about 11 hours between the interrogations. While Keller argues that "*Seibert* does not require that the statements be taken in rapid succession," the duration between the statements certainly is a factor to consider, *Seibert*, 542 U.S. at 615–16. As for the "setting," in *Seibert*, both instances of questioning occurred in the same room. 542 U.S. at 604–05, 616. But here, Keller had moved from the ER to the ICU. Concerning the "continuity of police personnel," in *Seibert*, the same officer conducted both interrogations. 542 U.S. at 604–05, 616. Here, while a different officer, Investigator Show, conducted the first ER interview, the same officer,

Investigator Brown, conducted the second ER interview and the ICU questioning. Therefore, we recognize that this factor could be considered to arguably weigh in Keller's favor. With respect to the "degree to which the interrogator's questions treated the second round as continuous with the first," in *Seibert*, the officer stated, "we've been talking . . . about what happened . . . haven't we?" thus referring "back to the confession already given." 542 U.S. at 616. But here, as the Mississippi Supreme Court concluded, the "police approached the interview anew without relying on anything revealed in the first two interrogations." *Keller*, 138 So. 3d at 850. That is important. As discussed above, while Keller argues that Investigator Brown admitted he relied on the ER statement in his testimony, Investigator Brown only possibly admitted reliance on Keller's willingness to cooperate, not on his confession. While Keller avers that the "ICU interrogation exploits not only the unconstitutionally extracted agreement to cooperate elicited during the second ER interrogation, but also the substantive information involuntarily obtained from Keller during both ER interrogations," he cites no supporting evidence in the record.

All in all, these factors weigh in favor of the State such that the Mississippi Supreme Court did not unreasonably determine the facts when concluding that no *Seibert* two-step interrogation occurred.

\* \* \*

The district court properly concluded that the Mississippi Supreme Court did not unreasonably apply the law or facts in refusing to apply *Seibert*, because the two-step interrogation scenario *Seibert* contemplates did not occur here.

### C.   Voluntariness

Keller contends that, at the time he gave the ICU statement, he "was incapable of giving a voluntary statement, and law enforcement used his

fragile mental and physical state to coerce him into speaking." He says that when "holding otherwise, the Mississippi Supreme Court unreasonably applied clearly established Supreme Court precedent." He also argues that the court's factual determinations were unreasonable because "Keller could not have made a free decision of whether to waive his rights and make a statement to the interrogating officer." But we disagree on both counts.

First, the Mississippi Supreme Court did not unreasonably apply clearly established federal law. The Supreme Court has clarified the principles applicable in this context. When determining whether a statement is involuntary or coerced, the Supreme Court "has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). As part of those relevant circumstances, the Supreme Court has held, as discussed above, "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167; *see also United States v. Mendez*, 885 F.3d 899, 910 (5th Cir. 2018) ("A statement cannot be involuntary in the absence of coercive police activity.").

The Mississippi Supreme Court reasonably applied Supreme Court authority. Specifically, it explained that "[c]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," and, "[a]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Keller*, 138 So. 3d at 851 (quoting *Connelly*, 479 U.S. at 164, 167). With these standards in view, the Mississippi Supreme Court found supported by the record the trial court's conclusion that "the record [was] devoid of any suggestion that police resorted to physical or psychological pressure" and "Keller was not worn

down by improper interrogation tactics." *Id.* (citation modified). Accordingly, that court concluded that there was no police coercion, and this was a reasonable application of the above-cited authority. He has not demonstrated that the Mississippi Supreme Court unreasonably applied Supreme Court precedent.[5]

Second, the Mississippi Supreme Court's decision was not based on an unreasonable determination of the facts. The Mississippi Supreme Court concluded that the trial court's fact findings concerning the lack of coercive tactics used during Keller's questioning were supported by the record and not manifestly erroneous. *Keller*, 138 So. 3d at 851. Among other things, the court found supported by the record the trial court's conclusions that: "Keller gave a full confession to the murder in a series of coherent, narrative responses"; Keller's ER statements were not exploited during the ICU questioning, *id.* at 850; police did not use any "physical or psychological pressure"; "the statements by police as to what was going to happen to Keller and when the officers could give Keller water were not coercive"; "Keller was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit," *id.* at 851 (citation modified); "Keller gave no indication of the pain or distress he had exhibited in the emergency room"; and "Keller gave a detailed statement without coaxing," *id.* at 852.

---

[5] Keller cites a few other cases in which significant police coercion was apparent and emphasizes that even subtle police persuasion used to exploit a defendant's mental state may render a statement involuntary. But Keller's case is far afield of those he cites. Coercive police activity was readily apparent in each case Keller relies on. *See Blackburn*, 361 U.S. at 207; *Fikes v. Alabama*, 352 U.S. 191, 195–97 (1957); *Mincey v. Arizona*, 437 U.S. 385, 398–400 (1978). Unlike in those cases, Keller does not cite any evidence in the record to support his proposition that the police took advantage of his situation or engaged in conduct comparable to *Blackburn*, *Fikes*, or *Mincey*.

No. 25-70002

Keller fails to demonstrate that these conclusions were unreasonable. Keller focuses on Dr. Jackson's statements that Keller had been given morphine before giving the ICU statement and had cocaine in his system, but the trial court and the Mississippi Supreme Court saw things differently. As such, Keller has not undermined any of the above factual determinations, much less provided clear and convincing evidence to overcome the presumption that state court findings of fact are correct.

\* \* \*

The district court correctly concluded that the Mississippi Supreme Court reasonably determined that Keller's ICU statement was voluntary. Accordingly, its resolution of this issue did not involve an unreasonable application of clearly established federal law, nor was it based on unreasonable determinations of fact.

### D.    Valid *Miranda* waiver

Keller last asserts that the Mississippi Supreme Court's conclusion that he made a new and valid *Miranda* waiver was "contrary to" Supreme Court precedent and relied on "an unreasonable determination of facts." Again, we disagree.

First, the Mississippi Supreme Court's conclusion was not contrary to Supreme Court precedent. As the Supreme Court has explained, a defendant's waiver of his *Miranda* rights "must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (citation modified). Though "a valid waiver will not be presumed simply from the silence of the accused after warnings are given," "waivers can be established even absent formal or express statements of waiver." *Id.* at 383 (citation omitted). That

17

is, the waiver may be "implicit," "implied from all the circumstances." *Id.* at 384. For instance, waiver "may be implied through the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Id.* (citation modified).

The Mississippi Supreme Court's decision relied on, and was consistent with, these principles. *Keller*, 138 So. 3d at 854. The court recognized that it was to consider the whole course of questioning to determine whether an implied waiver had been made. *Id.* (citing *Berghuis*, 560 U.S. at 388). It recognized that Keller responded "I understand" after Investigator Brown read Keller his *Miranda* rights, *id.* at 853, "appeared coherent and alert when answering . . . questions," and, "with minimal prompting," explained "the series of events leading up to his having entered [the] convenience store," *id.* at 854. The court also agreed with the trial court that Keller "sounded alert, spoke coherently, did not appear to be in pain, and responded to the questions with clear, understandable answers"; and that "[t]here was no evidence of coercion, pressure, or promise of reward on the part of the interrogating officer." *Id.* With all of this in view, the court held that, "[e]ven if 'I understand,' is not an express waiver, the demeanor and responses of Keller throughout the interview were sufficient to convey an implied waiver and willingness to confess to police." *Id.* This holding tracks *Berghuis*.

Keller's reliance on *Tague v. Louisiana*, 444 U.S. 469 (1980) (per curiam), does not alter this conclusion. In *Tague*, the Supreme Court, after noting that "courts must presume that a defendant did not waive his rights," held that the defendant's statement was inadmissible because "no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights." *Id.* at 471. Indeed, the Court in *Berghuis* cited *Tague* as an example of a case where there was "no evidence that the accused understood his *Miranda* rights." 560 U.S. at 384. But that is not the situation presented

in this case. Here, by contrast, Keller stated "I understand" after hearing a full recitation of his *Miranda* rights, stated "All right" after Investigator Brown said that he was "gonna [sic] let [Keller] go ahead" and "tell me everything," and went on to provide a detailed statement with hardly any prompting. Keller misunderstands the situations in which the presumption discussed in *Tague* may be dispositive.

Second, the Mississippi Supreme Court's decision was not based on an unreasonable determination of the facts. The Mississippi Supreme Court found the trial court's factual findings to be supported by the record, including Investigator Brown's impressions of Keller's demeanor and articulation during questioning. *Keller*, 138 So. 3d at 854. Keller, though, argues that the court unreasonably determined the facts because it disregarded "expert testimony that Keller was incapable of consent." That testimony came from Dr. Jackson.

Contrary to these assertions, the Mississippi Supreme Court did not make any unreasonable factual determinations. For one, the State presented competing evidence from Dr. Bredemeier. He explained that the amount of morphine in Keller's system would not have made him "incoherent" or unable to "understand" what was "going on around him." The Mississippi Supreme Court acknowledged Dr. Bredemeier when discussing the factual background of Keller's case, *Keller*, 138 So. 3d at 832, and the trial court appears to have relied on Dr. Bredemeier's testimony. In light of this testimony, Keller is unable to say that the court's determination was unreasonable. But for another, even without Dr. Bredemeier's testimony, Keller cannot prevail. In the face of Dr. Jackson's testimony, the Mississippi Supreme Court agreed with the trial court's credibility determinations and conclusion that Keller was in a much-improved state, was coherent, and spoke clearly, consistent with Investigator Brown's testimony. *See Keller*, 138 So. 3d at 854. Restating the fact that conflicting evidence was presented in

the state courts does not render the Mississippi Supreme Court's decision unreasonable, nor does it satisfy AEDPA's demands. Keller has not overcome the presumption that the state court's findings are correct because he has failed to rebut these findings "by clear and convincing evidence." *Valdez*, 274 F.3d at 947 (citing 28 U.S.C. § 2254(e)(1)).

\* \* \*

In the end, the district court correctly held that the Mississippi Supreme Court's determination was neither contrary to clearly established federal law nor was based on an unreasonable determination of the facts.

## IV.    Conclusion

For the foregoing reasons, we AFFIRM.

No. 25-70002

Stephen A. Higginson, *Circuit Judge*, concurring:

I concur in the majority's outcome for the reasons stated by the district court in its comprehensive order. *See Keller v. Cain*, No. 1:21-CV-134-KHJ, 2024 WL 4268134, at *54–74 (S.D. Miss. Sept. 23, 2024). The Mississippi Supreme Court did not unreasonably apply clearly established law or base its decision on unreasonable determinations of the facts. *See* 28 U.S.C. § 2254(d).